Matthew Dirkes (State Bar No. 255215)
matt@illovskygates.com
ILLOVSKY GATES & CALIA LLP
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorney for Defendant
Rory Spencer Rickey

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>          v.<br><br>RORY SPENCER RICKEY,<br><br>                     Defendant. | Case No. 3:23-cr-00345-TLT-4<br><br>**RORY RICKEY'S**<br>**SENTENCING MEMORANDUM**<br><br>Date:   February 13, 2026<br>Time:   11:00 a.m.<br>Judge:  Hon. Trina L. Thompson<br>Court:  9, 19th Floor |

Two and a half years ago, when he was 23, Rory Rickey made an uncharacteristically bad decision and agreed to deliver drugs for a young Stanford graduate.  As admitted in the Plea Agreement, he made one delivery (where no money changed hands) and was arrested three weeks later.

Mr. Rickey's decision to engage in this behavior is not easily explained.  He'd never been arrested, let alone charged with any criminal conduct.  It's widely agreed that he's smart; at the time of the offense conduct, he was a student at U.C. San Diego and had excelled academically in middle and high school.  But he also struggled with serious mental health issues, undoubtedly exacerbated by a difficult childhood and the chronic abuse of marijuana for six years, beginning when he was 17.  Those issues, combined with his youth, perhaps provide the best explanation for how he ended up facing a sentencing hearing for a federal drug crime.

Since his arrest more than two years ago, Mr. Rickey has done a remarkable job reorienting the direction of his life.  He committed himself to his studies and, as undersigned counsel understands it, completed his last two courses at U.C. San Diego this past December.  He's remained out of trouble and taken proactive steps to improve his mental health, including voluntarily entering into an intensive inpatient program last year.

Given the aberrational nature of the offense, Mr. Rickey's limited role in it, and his laudable post-offense rehabilitation, we respectfully submit that a sentence of credit for time served and two years of supervised release is sufficient and no greater than necessary to impose just punishment here.  A single delivery of drugs need not result in the harsh punishment of a prison sentence.

## I.   HISTORY AND CHARACTERISTICS OF MR. RICKEY

Mr. Rickey and his brother never knew what it was like to have a loving and supportive environment at home.  Their parents divorced when Mr. Rickey was four years old.  Presentence Investigation Report, ECF No. 194, ¶ 71.  The split was acrimonious; Mr. Rickey describes how the disfunction between his parents put him "in the middle of their animosity," so much so that he "felt unsafe" and "unwanted as a child."  PSR ¶ 72; *see also* Letter from M. Rickey (Mr. Rickey's mother)

at 1-2 (describing the "high conflict" divorce).[1] Mr. Rickey and his brother "lacked residential stability" and "moved around a lot," so much so that he attended three different elementary schools. PSR ¶ 71. Primarily raised by his mother, he also spent time at his father's house, with the custody exchange occurring at a gas station. PSR ¶ 72. Mr. Rickey and his brother continuously bounced from one household, where the parent "often neglected them" and was "emotionally distant," to the other parent's house, where the environment and emotional intensity felt "overbearing" and micromanaged. *Id.*

Even with all of this, Mr. Rickey thrived in school. His mother relates how he was a straight-A student in elementary and much of high school. Letter from Mr. Rickey at 2. He even contended to be the valedictorian of his high school. PSR ¶ 71. A forced move out of his mother's house to his father's, and a corresponding change in high schools, disrupted his academic success and "derailed him emotionally." PSR ¶ 71.

He soon began self-medicating with marijuana, which he used and abused until his arrest in this case. PSR ¶¶ 82, 83. The potentially harmful effects of prolonged marijuana use on developing brains is becoming more clear. "Numerous studies show that marijuana can have a deleterious impact on cognitive development in adolescents, impairing executive function, processing speed, memory, attention span and concentration."[2] "The developing brain is particularly vulnerable to the adverse effects of cannabis, showing substantial degradation (even visible on MRI) in both gray (neuronal) and white (connections) matter."[3] "[R]eductions in gray matter structures, crucial for handling information, and compromises in white matter integrity, essential for communication between brain areas, have been seen in the brains of adolescent cannabis users," and [t]his architectural reconfiguration of the developing brain contributes to deficits in cognition, memory,

---

[1] The eight letters of support for Mr. Rickey have been submitted to U.S. Probation to be transmitted to the Court.

[2] https://www.nytimes.com/2019/06/16/opinion/marijuana-brain-effects.html (last visited Nov. 6, 2026)

[3] https://sterlinginstitute.org/cannabis-and-the-brain-from-adolescence-to-adulthood/ (last visited Nov. 6, 2026)

attention, and decision-making."[4]  "[F]unctional imaging research (fMRI) shows how these anatomical changes translate to areas of reduced brain activity that match observed performance deficits," and "[t]eenagers who use cannabis show altered and reduced brain activation when engaging in intellectual tasks compared to their non-using peers."[5]

As Mr. Rickey described it, marijuana "helped him forget about his problems" stemming from his childhood.  PSR ¶ 83.  It also likely constituted an attempt to address serious untreated mental health issues, including depression and anxiety.  Those issues, detailed in the PSR, were not diagnosed until 2022, though Mr. Rickey believes he has suffered from them for "all his life."  PSR ¶ 80.  Since the diagnosis, he's taken the difficult but necessary steps in proactively seeking help, including inpatient treatment last year and regular treatment afterwards.  *Id.*  He now "feels more hopeful," even with this pending case, and is able to "make[] plans for the future."  *Id.*

Despite his difficult childhood in what his own mother describes as a "toxic family dynamic," Letter from Mr. Rickey at 4, and in the face of serious drug use and mental health issues, Mr. Rickey nonetheless managed to be reservoir of compassion and support for others.  Thomas Aquinas apparently once said there is "nothing on this earth more to be prized than true friendship."  The letters provided to the Court reveal Mr. Rickey's long-standing commitment to those fortunate to call him a friend.

Carmen describes Mr. Rickey as a "close friend . . . for nearly ten years."  Letter from Carmen.  They attended high school together where Mr. Rickey "filled the role of the supportive older brother," which Carmen lacked at home.  *Id.*  Mr. Rickey gave her driving lessons and "knew how to push [her] out of [her] comfort zone without putting [her] in harm's way."  *Id.*  He was always someone she could go to, whether to cry, scream, laugh, or just sit in silence."  *Id.*

Sara B. tells how Mr. Rickey "consistently shows up for the people around him, especially during stressful or overwhelming situations."  Letter from Sara.  When her car was stolen, Mr. Rickey "stepped in immediately without being asked" and helped her file police reports, deal with the insurance company, locate the car, and find a mechanic to repair it.  *Id.*  When she had to move on

---

[4] *Id.*
[5] *Id.*

SENTENCING MEMORANDUM
                                                Case No.: 3:23-cr-00345-TLT-4

short notice, Mr. Rickey helped her pack up her apartment and then, while she was away for work, he assembled her furniture in her new home. *Id.* There were not "one-off gestures," but instead reflected a broader pattern of "how he naturally responds when someone needs help, without expecting anything in return." *Id.*

Medical student Eugene U. and Mr. Rickey have been friends since the eighth grade. Letter from Eugene. Eugene relates how, in high school, Mr. Rickey "consistently got top grades and was an active member of multiple clubs, a natural leader and a role model." *Id.* In Eugene's telling, "when [Mr. Rickey] has a goal and a positive environment, he works harder than anyone else I know." *Id.* While Eugene was shy, Mr. Rickey played the part of the "outgoing and honest friend who helped [Eugene] find [his] confidence." *Id.* Mr. Rickey encouraged Eugene to take AP Chemistry as a sophomore, attempted by only two other students in their class.

Sunnin J. has known Mr. Rickey for more than a decade. Letter from Sunnin. Sunnin describes Mr. Rickey as "consistently considerate and attentive to those around him." *Id.* While Sunnin "struggled socially while growing up," Mr. Rickey was "one of the few people who made a deliberate effort to include [him]" by "checking in regularly, walking home together, and ensuring [he] was not left out in group settings." *Id.* Even as their lives have taken different directions, Mr. Rickey has "remained communicative and dependable." *Id.* Since Sunnin returned to California in July of last year, he's seen Mr. Rickey "take deliberate steps toward stability and self-improvement." *Id.* He describes Mr. Rickey "as someone capable of reflection and accountability, particularly when faced with difficult circumstances." *Id.*

Ethan M. and Mr. Rickey have been friends since the seventh grade. Letter from Ethan. He tells how Mr. Rickey was a "big brother figure" for him. *Id.* He saw how Mr. Rickey excelled in school and wanted to emulate him. *Id.* More importantly, he relates how Mr. Rickey helped him succeed and describes Mr. Rickey as "charitable with praise and recognition." *Id.*

According to Katherine S., a friend of the family, Mr. Rickey was "always thoughtful, pleasant, and hardworking" and even helped her and her family move. *Id.*

Finally, Ryan Rickey describes his older brother as someone he "could always count on." Letter from Ryan. In elementary school, Mr. Rickey taught Ryan his multiplication tables in advance

so Ryan could get ahead of the curve. *Id.* Mr. Rickey walked him to school and would stay afterwards with him if their mother hadn't arrived to pick them up. *Id.* In Ryan's telling, Mr. Rickey "was always there when you needed him." *Id.*

These personal accounts of familial relationships and friendships, many of which span more than a decade, reveal Mr. Rickey to be a kind, caring, compassionate, and selfless companion who doesn't hesitate to put the needs of others before his own. At his core, these letters show him to be a good person.

## II.   NATURE OF THE OFFENSE

Mr. Rickey agreed to work as a courier for a Standford graduate who sold drugs throughout the Bay Area. PSR ¶ 10-41. As set forth in the Plea Agreement and the PSR, Mr. Rickey delivered fake Adderall pills that contained methamphetamine on a single occasion in August 2023. ECF No. 120 ¶ 2; PSR ¶¶ 39-41. No money changed hands during the transaction. *Id.* The recipient of the drugs was an undercover DEA agent. *Id.* Mr. Rickey was arrested three weeks later and spent five days in custody before being released on pretrial supervision. PSR at 1. He has pleaded guilty to a single count of distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). ECF No. 120. With a two-level reduction for group disposition, he agrees that the adjusted offense level is 21, which corresponds to a Guidelines range of 37-46 months. Mr. Rickey also agrees with the conclusion in the PSR that a downward variance from that range is appropriate given Mr. Rickey's "dysfunctional upbringing," mental health struggles, and substance abuse disorder. PSR, Sentencing Recommendation at 2-3.

## III.   A SUFFICIENT AND FAIR SENTENCE

A sentence must be "not greater than necessary" to "provide just punishment," deter criminal behavior, and protect society. 18 U.S.C. § 3553(a). "The Supreme Court has consistently instructed that 'the punishment should fit the offender and not merely the crime,' and thus judges should use 'the fullest information possible concerning the defendant's life and characteristics' to determine the appropriate sentence." *United States v. Trujillo*, 713 F.3d 1008-09 (9th Cir. 2013) (quoting *Pepper v. United States*, 131 S. Ct. 1229, 1235, 1240 (2011)).

SENTENCING MEMORANDUM
Case No.: 3:23-cr-00345-TLT-4

We respectfully submit that a sentence of credit for time served and two years of supervised release is justified by the circumstances of this case and consistent with the statutory factors the Court will consider.

Perhaps most importantly, Mr. Rickey's success on pretrial release since his arrest two and a half years ago shows that he is capable of being a productive and law-abiding member of society. Not only has he stayed out of trouble, but he finished college at U.C. San Diego, a remarkable achievement for someone facing a federal prosecution. The Supreme Court has "made clear that post sentencing or post-offense rehabilitation – particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct – [is] a critical factor to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (*citing Pepper*, 131 S. Ct. at 1242; *Gall v. United States*, 128 S. Ct. 586, 169 (2007)); *United States v. Lizarraras-Chacon*, 14 F.4th 961, 967 (9th Cir. 2021) (section 3553(a) analysis should include information relating to "post-sentencing and post-offense rehabilitation."). Mr. Rickey's post-offense rehabilitation demonstrates that prison is not necessary.

Nor would any of the other statutory factors be furthered by a custodial sentence. While a custodial sentence would, without any doubt, punish Mr. Rickey, such punishment would be overly harsh, and not "just," 18 U.S.C. § 3553(a)(1)(A), given the nature and circumstances of Mr. Rickey and the offense conduct.

As for the need for specific deterrence, 18 U.S.C. § 3553(a)(1)(B), Mr. Rickey will not reoffend. The offense conduct, comprised of a single delivery of drugs, was an aberration, driven by serious mental health issues and drug use. He'd never been arrested previously. Prison will not lead to a reduced risk of recidivism. It may have the opposite effect. The Department of Justice itself has concluded that longer sentences do not increase deterrence. The National Institute of Justice, the research, development and evaluation agency of the Department of Justice, stated in 2016 that "the chance of being caught is a vastly more effective deterrent than even draconian punishment."[6]

---

[6] https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last visited Feb. 6, 2026).

6                    SENTENCING MEMORANDUM
                     Case No.: 3:23-cr-00345-TLT-4

"[P]rison sentences (particularly long sentences) are unlikely to deter future crime."[7]  In fact, prison sentences may actually lead to increased future criminal behavior:  "Persons who are incarcerated learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[8]

For similar reasons, the public does not need protection from Mr. Rickey.  18 U.S.C. § 3553(a)(1)(C).  There is nothing to suggest he'll commit further crimes, especially now that he has finished college and received treatment for his mental health and drug dependency issues.

With respect to general deterrence, 18 U.S.C. § 3553(a)(1)(B), the government's prosecution of the leader in this case received ample press, as did her sentencing.[9]  Whether Mr. Rickey goes to prison for a single drug transaction two and a half years ago will have no deterrent effect on the decisions by other individuals to engage in drug trafficking in the future.

Furthermore, prison would interfere with, and almost certainly prevent, Mr. Rickey's ongoing mental health treatment. 18 U.S.C. § 3553(a)(1)(D).  It is hard to imagine a place less suited to provide mental health treatment than prison.

Mr. Rickey's age – 23 – at the time of the offense conduct also supports our recommended sentence.  A scientific consensus now exists that emerging adulthood – ages 18 to 25 – is a period of life distinct from both adolescence and adulthood.  Gibbons & Ashdown, A Review of Emerging Adults in America: Coming of Age in the 21st Century, 51 PsycCRITIQUES 3, 3 (2012) ("The introduction of the concept of emerging adulthood is arguably the most important theoretical contribution to developmental psychology in the past 10 years and has spawned a great deal of research."); Nat'l Academies of Science, Engineering, and Medicine *et al*., The Promise of Adolescence: Realizing Opportunity for All Youth (2019) at 273 ("[T]he latest adolescent brain development research shows that the developmental period from adolescence through emerging adulthood features the creation of new neural pathways and the enhancement of connections between

---

[7] *Id.*

[8] *Id.*

[9]  *E.g.*, https://www.cbsnews.com/sanfrancisco/news/oakland-the-shop-illegal-drug-delivery-service-leader-sentenced-federal-prison/ (last visited Feb. 6, 2026)

7    SENTENCING MEMORANDUM
Case No.: 3:23-cr-00345-TLT-4

brain systems and neural networks."). The scientific community agrees that the human brain does not reach full maturation until at least age 25, when an emerging adult becomes fully developed. *Id.* at 296 ("although adolescents may develop some adult-like cognitive abilities by late adolescence (roughly age 16), the cognitive control capacities needed for inhibiting risk-taking behaviors continue to develop through young adulthood (age 25)").

As a result, risky behavior peaks not during adolescence but emerging adulthood. Scott *et al*., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy, 85 Ford. L. Rev. 641, 644 (2016); Steinberg *et al*., Age Differences in Future Orientation and Delay Discounting, 80 Child Dev. 28, 35 (2009). Research reveals that criminal behavior decreases persistently after age 25. U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (Dec. 2017) (re-incarceration rate highest for individuals released before age 25). This timeline correlates with research on when brain development is complete, rendering individuals less prone to immature behavior. Monahan *et al*., Psychosocial (Im)maturity From Adolescence to Early Adulthood: Distinguishing Between Adolescence Limited and Persisting Antisocial Behavior, 25 Dev. & Psychopathology 1093, 1093–1105 (2013).

The Supreme Court has recognized this science and described the "hallmark features" of youth that render young offenders categorically less culpable than fully mature offenders: "immaturity, impetuosity, and failure to appreciate risks and consequences . . . [the inability to] extricate [one]self [from a] brutal or dysfunctional [home environment] . . . [susceptibility to] familial and peer pressures . . . [and amenability to] rehabilitation . . . ." *Miller v. Alabama*, 567 U.S. 460, 477 (2012).

Mr. Rickey exhibited some of those "hallmark features." The presence of those features – immaturity, impetuosity, failure to appreciate risks and consequences, susceptibility to peer pressure, and inability to control his environment – suggests he is less culpable than fully mature offenders and should be sentenced accordingly. *Id.* at 471 (juveniles "are more vulnerable . . . to negative influences and outside pressures including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings.").

SENTENCING MEMORANDUM
Case No.: 3:23-cr-00345-TLT-4

Finally, the requested sentence would not result in unwarranted sentence disparities with Mr. Rickey's codefendants.  18 U.S.C. § 3553(a)(6).  Ms. Gonzalez, who received a sentence of 50 months, was the leader and organizer and was an adult at the time of her offense conduct.  Mr. Gaestel, sentenced to 48 months, had criminal history, a lengthy record of drug abuse, and, like Ms. Gonzalez, was also an adult at the time of his offense conduct.  They do not have "similar records" and have not "been found guilty of similar conduct" as Mr. Rickey.  Any sentencing disparity between Mr. Rickey and those codefendants would not be "unwarranted."  18 U.S.C. § 3553(a)(6).

**IV.    CONCLUSION**

For the reasons stated, we respectfully suggest that a sentence of credit for time served and two years of supervised release is a sufficient and fair sentence for Mr. Rickey.

Dated: January 5, 2026                    ILLOVSKY GATES & CALIA LLP

                                           */s/Matthew Dirkes*
                                           Matthew Dirkes

                                           Attorney for Rory Rickey